# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DALE R. ROSNER**
        **Plaintiff,**

   v.                                                    Case No. 20-C-1346

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

An Administrative Law Judge ("ALJ") denied plaintiff Dale Rosner's application for social security disability benefits. Plaintiff seeks judicial review of the denial. A reviewing court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and contains an accurate and logical bridge from the evidence to the conclusions. Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). The ALJ need not in building the requisite bridge evaluate in writing every piece of evidence in the record, but he must sufficiently articulate his assessment of the record to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning. Rohan v. Chater, 98 F.3d 966, 971 (7th Cir. 1996).

**I.**

Eligibility for disability benefits is determined by applying a five-step analysis, in which the ALJ considers whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or

equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other jobs existing in significant numbers in the national economy. Butler v. Kijakazi, 4 F.4th 498, 501 (7th Cir. 2021). The claimant bears the burden at steps one through four, but at step five the burden shifts to the Commissioner to prove that the claimant can perform other work in the economy. Id. To meet this burden, ALJs generally obtain testimony from a vocational expert ("VE") as to the availability of jobs the claimant could perform in light of his limitations. Id.

In this case, the ALJ concluded that plaintiff's severe back impairment, compounded by clinical obesity, while not conclusively disabling, did limit him to a reduced range of sedentary work, precluding the performance of his past relevant job as a foundry worker. (Tr. at 13-21.) Relying on the testimony of a VE, however, the ALJ found that there are jobs existing in significant numbers in the economy that plaintiff can perform. (Tr. at 22-23.)

The VE testified that a person with plaintiff's limitations could work as a food beverage order clerk, DOT # 209.567-014, with 20,000 such jobs in the national economy; semi-conductor bonder, DOT # 726.685-066, 22,000 jobs; and circuit layout taper, DOT # 017.684-010, 10,000 jobs. (Tr. at 58.) Plaintiff's counsel asked:

    Q    What is the source of the numbers that you have given here?

    A    Job Browser Pro by SkillTRAN.

    Q    And are you familiar with how the program works?

    A    What do you mean by how the program works?

    Q    I'm saying that, the Job Browser Pro – you know, so you typed in for the food beverage order clerk job, you typed in 209.567-014, and it came back with 20,000 jobs; is that correct, based on the settings you have in

2

>   the program?
> 
> A   I didn't just enter the DOT code. I have a database that I have listed so that I don't have to enter it –
> 
> Q   Okay.
> 
> A   – every time I need to look up things.
> 
> Q   How does – mathematically, how does Job Browser Pro come up with 20,000 jobs based on that DOT code?
> 
> A   Oh, I do not know, sir.

(Tr. at 62-63.) Plaintiff's counsel then objected "to this testimony under the Chavez holding, at least the part as it relates to the numbers. . . . I mean, I think they're just simply using a commercially available computer program [which] is not in compliance with Chavez[.]" (Tr. at 63.) The ALJ asked no further questions of the VE.

In his decision, the ALJ overruled plaintiff's objection, stating:

> The vocational expert has professional knowledge, training and experience in job placement. She also cited using JobBrowser Pro, a commonly used source for vocational testimony. Markedly, as explained in Chavez, JobBrowser Pro uses the occupational density model to determine existing job numbers, which results in significantly fewer jobs cited than the equal distribution model used by other vocational expert software programs. Unlike in Chavez, the claimant and his representative fail to cite another commonly used vocational source that results in fewer jobs cited than JobBrowser Pro and as such, there is no issue between which vocational source should be used relative to the other. Rather, the claimant's representative seems to object to the vocational expert's testimony because she does not know the exact algorithm JobBrowser Pro uses to provide its cited numbers in the occupational density model. However, as articulated in Liskowitz v. Astrue, 559 F.3d 736 (7th Cir. 2009), "The witness was testifying as a vocational expert, not as a census taker or statistician. Indeed, even if the VE had happened to know something about the statistical basis for her testimony, she arguably still would not be in a position to fully vindicate her conclusions. After all, statisticians use arithmetic operations, but few probably have studied the foundations of arithmetic in set theory. Is the statistician's use of arithmetic therefore unjustified? Clearly not. In administrative proceedings, no less than in ordinary life, "explanations come to an end somewhere." Accordingly, the vocational expert's job information is found to be reliable.

(Tr. at 22-23.)

Relying on Chavez v. Berryhill, 895 F.3d 962 (7th Cir. 2018), plaintiff argues that the ALJ failed to obtain a reasoned and principled explanation from the VE regarding her reliance on the SkillTRAN software. (Pl.'s Br. at 12.) The Seventh Circuit recently addressed the standards for addressing such claims:

> As applied to an expert's estimate of available jobs in the national economy, "the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." Chavez, 895 F.3d at 968. This does not mean that the VE's opinion must satisfy the standard for admission of expert testimony under Rule 702 of the Federal Rules of Evidence, which does not apply in disability proceedings. Id. As we explained in Chavez, a precise count is not necessary: "A VE's estimate will be just that—an estimate." Id. Still, the method used to estimate job numbers "must be supported with evidence sufficient to provide some modicum of confidence in its reliability." Id. at 969. And where, as here, the claimant challenges the job-number estimate, the ALJ "must require the VE to offer a reasoned and principled explanation" of the method he used to produce it. Id. at 970. And the explanation must be sufficient to instill some confidence that the estimate was not "conjured out of whole cloth." Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002).
> . . .
> The Supreme Court's recent decision in Biestek explained that a vocational expert's job-number testimony will survive review under the substantial-evidence standard as long as it rests on a well-accepted methodology and the expert describes the methodology "cogently and thoroughly." 139 S. Ct. at 1155.

Brace v. Saul, 970 F.3d 818, 821-22 (7th Cir. 2020).

Plaintiff contends that the VE simply relied on the results of a query to a computer program to provide job numbers. She identified no other source of information, stating only that she entered the information from JobBrowser Pro into a database so she did not need to enter the information in the software every time she has to look things up. Plaintiff argues that the VE offered nothing to allow the ALJ to conclude that reliance on the program alone was a reliable method for deriving job incidence data. (Pl.'s Br. at 12.)

4

"The Seventh Circuit has not spoken directly on the reliability of the SkillTRAN software, and courts in this circuit have upheld the VE's use of SkillTRAN and the ALJ's reliance on the numbers produced by SkillTRAN when the VE explains the methodology behind SkillTRAN." Foth v. Saul, No. 20-CV-113, 2021 U.S. Dist. LEXIS 27721, at *23 (E.D. Wis. Feb. 12, 2021) (collecting cases). While a VE's explanation need "not reveal the precise mechanics and statistical model involved," Bruno v. Saul, 817 Fed. Appx. 238, 243 (7th Cir. 2020), it must be sufficient to instill the court with some confidence in its reliability. In Foth, for instance,

> The VE testified that she estimates job numbers by taking the total number of jobs for a particular SOC code found in the SkillTRAN, verifies it through the O*Net, multiplies the percentage of jobs from the OES group that have the same SVP and physical demand levels, and then "time[s] that number, persons employed in that job, and I get an estimated number of jobs in the national economy."

2021 U.S. Dist. LEXIS 27721, at *22. Similarly, in Dunn v. Kijakazi, when the ALJ asked about her sources and methodology, the VE responded:

> "Well, I rely on a variety of resources including SOC codes, O*Net, information and dat[a] from SkillTRAN's Occupational Employment information." She continued that "to get to the numbers, I would take the total number of jobs for a particular SOC code on SkillTRAN and then I multiply the percentage of jobs from the OES group that have the same SVP and physical demand level times the number of person[s] employed in the job to get an estimated number of jobs in the national economy."

No. 20-C-1113, 2021 U.S. Dist. LEXIS 213983, at *14 (E.D. Wis. Sept. 24, 2021) (record citations omitted). In the present case, the VE offered no explanation as to how she used the JobBrowser Pro software to produce the numbers in her database, and she admitted that she did not know how JobBrowser Pro comes up with numbers. This does not suffice, even under the low substantial evidence standard.

The reasons offered by the ALJ for accepting the VE's testimony are unpersuasive.

5

First, the ALJ mentioned the VE's knowledge, training, and experience. However, "a claimant need not object to an expert's qualifications in order to object to the expert's methodology." Brace, 970 F.3d at 823. While the VE relied on her experience in job site analysis to swat away plaintiff's questions regarding the effect of a sit/stand option on his ability to do the identified jobs (Tr. at 60-61), she failed to relate her experience to the job numbers. See Rennaker v. Saul, 820 Fed. Appx. 474, 479 (7th Cir. 2020) ("Although the VE pointed to his own education, research, training, and experience in job placement and vocational rehabilitation to explain the kind of work Rennaker could perform, the VE did not explicitly tie this background to his estimate of nationwide job numbers.").

Second, the ALJ stated that JobBrowser Pro is commonly used by vocational experts. Accepting that as true does nothing to ensure the reliability of the job numbers in this case. While courts in this circuit have affirmed decisions that rely on JobBrowser Pro estimates where VEs were able to describe the processes they employed, they have remanded in cases where VEs provided conclusory explanations of their processes and the ALJ failed to substantively address objections to JobBrowser Pro's reliability. Westendorf v. Saul, No. 19-cv-1019-jdp, 2020 U.S. Dist. LEXIS 136131, at *11-12 (W.D. Wis. July 31, 2020) (collecting cases). I am aware of no authority deeming the SkillTRAN programs reliable as a matter of law. See Dunn, 2021 U.S. Dist. LEXIS 213983, at *41.

Third, the ALJ suggested that Chavez endorsed the "occupational density model" used by JobBrowser Pro to determine existing job numbers, a method which results in significantly fewer jobs than the oft-criticized "equal distribution" method used by other vocational expert software programs. See 895 F.3d at 969-70. The Chavez court endorsed neither method; rather, it found that the VE failed to explain why he chose one method over the other. Id. at

6

970. It is true that the VE in this case, unlike in Chavez, did not offer two disparate job numbers based on two different methodologies. (See Def.'s Br. at 13.) But the error here is more fundamental: the VE identified no methodology at all. The ALJ noted that plaintiff failed to cite another commonly used vocational source producing fewer jobs than JobBrowser Pro, but the burden of presenting evidence at step five rests with the agency; plaintiff was not required to present his own vocational evidence. See id. at 970 ("By accepting the VE's estimates at step five because they were 'not contradicted,' the ALJ effectively and impermissibly shifted the burden to Chavez.").

Fourth, the ALJ stated that plaintiff "seems to object to the vocational expert's testimony because she does not know the exact algorithm JobBrowser Pro uses to provide its cited numbers in the occupational density model." (Tr. at 22.) The VE never mentioned "occupational density" or any other model in this case; she did not know how the program she used worked. In any event, requiring a VE to explain her methodology at some minimal level does not require her to be a computer programmer or a statistician.

The Commissioner responds that while plaintiff asked about the source of the job numbers, he did not ask any questions about the VE's method for calculating job numbers. (Def.'s Br. at 14-15.) The Commissioner cites Coyier v. Saul, 860 Fed. Appx. 426, 427-28 (7th Cir. 2021), where the court found that the claimant "waived any challenge to the VE's testimony by failing to ask any questions to reveal shortcomings in the job-number estimates or to submit a supplemental brief on the issue despite assuring the court prior to and at the hearing that he would do so."

While plaintiff could have done more, his approach was sufficient to trigger the ALJ's duty to inquire further into the VE's methodology in this case. As the portion of the hearing

7

transcript quoted above makes clear, plaintiff first asked the VE about the source of her numbers. He then asked the VE questions regarding how the JobBrowser Pro program works and how the VE used it to come up with the specific numbers used in this case. The VE referenced her own database, which she had apparently compiled based on previous queries to the JobBrowser Pro program, but she admitted that she did not know how the program came up with the numbers. Based on the VE's admission that she did not know how the program worked, plaintiff objected to her testimony as it related to the job numbers, arguing that simply using a commercially available computer program does not comply with Chavez. The ALJ apparently found the issue adequately raised, as he addressed it at length in his decision, offering several reasons why he found the VE's testimony reliable. As plaintiff notes in reply, because the VE failed to offer testimony as to the reliability of JobBrowser Pro, the ALJ was left to offer his own endorsement of the software. (Pl.'s Rep. Br. at 4.)

The Commissioner notes that the Seventh Circuit has not enjoined use of the SkillTRAN software, and that a number of courts have held that these programs are an acceptable source upon which a VE can base her testimony. (Def.'s Br. at 15-16.) I agree that JobBrowser Pro can be a reliable source, so long as the VE offers some explanation as to how she used the program in the particular case. The Commissioner also seeks to distinguish Westendorf because in that case the claimant offered a more detailed objection to the job number estimates. (Def.'s Br. at 16.) As indicated above, I find that plaintiff did enough to raise the issue here. Finally, the Commissioner notes that some courts have held a VE need not explain how the SkillTRAN software works. (Def.'s Br. at 17.) However, these decisions pre-date Chavez; the general approach now appears in cases like Foth and Westendorf. The matter must be remanded for a fresh step five determination.

**II.**

Plaintiff argues that the ALJ also erred in evaluating the credibility of his subjective allegations. (Pl.'s Br. at 18.) Because the matter must be remanded based on the step five error, I need not determine whether the ALJ committed reversible error on this point. I discuss plaintiff's arguments for the sake of completeness and note that plaintiff will be free to raise them on remand.

In determining whether a claimant is disabled, an ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, medications used, and treatment received for relief of the pain or other symptoms. Id. at *18-19. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his credibility determination only if it is "patently

9

wrong." Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021).

In the present case, the ALJ set forth the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p (Tr. at 16); summarized plaintiff's allegations, e.g., that his impairments limited his ability to lift, stand, sit, and perform postural and reaching activities (Tr. at 17); and reviewed the medical evidence, which documented plaintiff's severe back impairment, for which he underwent surgery in January 2015, and his morbid obesity (Tr. at 17-18). The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce some of the symptoms of the types alleged. However, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence.

(Tr. at 18.)

The ALJ next stated that the "record fails to fully substantiate the claimant's allegations of disabling symptoms." (Tr. at 18.) In support of this conclusion, the ALJ noted that plaintiff continued to evidence rather good objective functioning during exams, he stopped attending occupational therapy, recent treatment had been conservative, and he admitted performing a variety of daily activities (e.g., preparing meals, cleaning, mowing the lawn with a riding mower, shoveling his steps, grocery shopping) suggesting better capabilities than he claimed. (Tr. at 18-19.)

The ALJ accepted that plaintiff could not sustain the lifting, carrying, standing, or walking requirements of light or greater work and therefore was limited to sedentary work. Due to his reports of increased pain with extended sitting and standing, the ALJ added a requirement that

10

plaintiff be allowed to alternate between sitting and standing every 30 minutes without leaving the work station.  Additionally, plaintiff's radiating back pain and clinical obesity limited postural movements and climbing.  (Tr. at 19.)

Plaintiff alleges three flaws in the ALJ's analysis.  First, plaintiff contends the ALJ overlooked that even after his surgery plaintiff continued to have a "pars defect," i.e., a stress fracture, at L3.  Plaintiff's surgeon, Dr. Harrison, observed that plaintiff would continue to have back pain given his weight, and that there was not "much else to do." (Pl.'s Br. at 19.)  Plaintiff testified consistently at the hearing; when the ALJ asked about the lack of recent treatment, plaintiff responded: "Nothing more they can do.  That's what he told me.  He says there's nothing more he could do for me."  (Tr. at 55.)  Plaintiff argues that the ALJ's failure to acknowledge a physiological cause for ongoing back pain, for which his surgeon had no answer, undermined the ALJ's assessment.  (Pl.'s Br. at 20.)  He also faults the ALJ for relying on conservative treatment, when his doctor had nothing left to offer.  (Pl.'s Br. at 21.)

As the Commissioner notes, the ALJ did acknowledge the "unilateral pars fracture at L3" (Tr. at 17),[1] as well as the suggestion that plaintiff undergo bariatric surgery to help get his weight under control (Tr. at 18).  The ALJ also accepted that plaintiff experienced ongoing back pain, limiting him to sedentary work with postural limitations and a sit/stand option, greater limitations than the agency's medical consultants suggested.  (Def.'s Br. at 4, 7.)  Thus, as in Gedatus v. Saul, 994 F.3d 893, 901 (7th Cir. 2021), the ALJ noted some of the evidence favorable to plaintiff and "sided with [him] to a degree by determining [he] had severe impairments and needed some limitations on even 'light' duties. This is not a case where an

---

[1]In reply, plaintiff admits that he overstated this point in his main brief.  (Pl.'s Rep. Br. at 5.)

11

ALJ ignored evidence contrary to his conclusion."² Finally, the Commissioner notes that in the May 2015 note upon which plaintiff relies, Dr. Harrison recommended physical therapy, including an aquatic exercise program. "I don't [see] too much else to do." (Tr. at 1662.) As the ALJ noted, plaintiff subsequently attended occupational therapy but was discharged in January 2016 after he stopped going in September 2015.³ (Tr. at 18, 1626.)

Second, plaintiff argues that the ALJ failed to explain how the activities he listed were inconsistent with the allegations. (Pl.'s Br. at 21, citing Cullinan v. Berryhill, 878 F.3d 598, 603 7th Cir. 2017) ("[T]he ALJ did not explain why doing these household chores was inconsistent with Cullinan's description of her pain and limited mobility. Nor is any inconsistency obvious[.]").) The ALJ also failed to acknowledge plaintiff's limitations in performing those activities. (Pl.'s Br. at 22, citing Reinaas v. Saul, 953 F.3d 461, 467 (7th Cir. 2020) ("[T]he ALJ cited Reinaas's ability to use a chainsaw, mow the lawn, and care for his child but ignored his testimony about the pain and fatigue these activities cause him and his limitations with them.").)

The Commissioner responds that the ALJ satisfied his obligation to minimally articulate his reasons, and that the inconsistency between the activities and plaintiff's claims can be discerned with a common sense reading of the decision. (Def.'s Br. at 8-9.) The Commissioner further notes that the ALJ acknowledged some of plaintiff's limitations, e.g., his

---

²In reply, plaintiff suggests that if the ALJ had appreciated the pars defect as an ongoing pain generating condition, he may have given greater credence to the allegations. (Pl.'s Rep. Br. at 5.) Plaintiff may press the point on remand.

³In reply, plaintiff contends that the ALJ failed to link the occupational therapy discharge to his finding of conservative treatment. (Pl.'s Rep. Br. at 5-6.) The ALJ discussed the therapy discharge as part of his credibility analysis, noting that one would expect plaintiff to attend treatments if his condition truly was as limiting as alleged. (Tr. at 18.) In any event, plaintiff may on remand argue that his conservative treatment was due to limited options.

12

children helped with cleaning and grocery shopping. (Def.'s Br. at 9.) Even if the ALJ's discussion on this point was flawed, the Commissioner argues the error was harmless given the other reasons provided. (Def.'s Br at 9-10.) If, on remand, the ALJ decides to rely on plaintiff's activities, he should provide a more complete explanation.

Third, plaintiff argues that the ALJ cited three different credibility standards: (1) statements "not entirely consistent with the medical evidence and other evidence in the record"; (2) statements credible "only to the extent they can reasonably be accepted as consistent with the objective medical and other evidence"; and (3) statements not "fully substantiate[d]" by the record. (Tr. at 18.) The first is common boilerplate and the second a correct statement of the law, but plaintiff contends that the third variant imposes a higher burden on claimants than the law allows. The evidence need not "fully substantiate" a claimant's allegations; rather, the inquiry is whether the claimant's statements are "reasonably consistent" with the evidence. (Pl.'s Br. at 23-24, citing Rooney v. Saul, No. 18-CV-2030-SCD, 2020 U.S. Dist. LEXIS 115027, at *17-18 (E.D. Wis. June 30, 2020) (noting that the "fully substantiated" standard appears to be more rigorous than the one mandated by social security regulations).)

As the Commissioner notes, the Seventh Circuit recently rejected a similar argument in Gedatus:

> The ALJ found Gedatus's statements about her symptoms to be "not entirely consistent with the medical evidence and other evidence for the reasons explained in this decision." She criticizes the ALJ for applying the wrong standard. She argues the language "are not entirely consistent" means the ALJ required the evidence to be entirely consistent with her claims about her symptoms before he would accept her claims, and did not use the appropriate preponderance-of-the-evidence standard. But we do not read the ALJ's language that way. It is clear to us, given the context, that the ALJ merely used a polite way to say the weight of the evidence did not support all her claims.

994 F.3d at 900; see also Czadzeck v. Saul, No. 20-C-803, 2021 U.S. Dist. LEXIS 60566, at

13

*38 (E.D. Wis. Mar. 30, 2021) ("As courts have repeatedly noted, such boilerplate is harmless where the ALJ otherwise sets forth the correct legal standards, e.g., Harris v. Saul, 835 Fed. Appx. 881, 886 (7th Cir. 2020), and goes on to provide specific reasons for [his] conclusion, e.g., Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019); Loveless v. Colvin, 810 F.3d 502, 508 (7th Cir. 2016); Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013).").

The offending phrase here is "fails to fully substantiate," rather than "not entirely consistent." As plaintiff notes in reply, another judge in this district recently remanded based on an ALJ's use of inconsistent standards, including the "fails to fully substantiate" variant. Green v. Kijakazi, No. 20-CV-969, 2021 U.S. Dist. LEXIS 142304, at *16-18 (E.D. Wis. July 29, 2021). Because this case must be remanded based on the step five error, I need not determine whether the ALJ's use of such language here would independently require reversal. The ALJ should on remand ensure that his credibility finding is based on the correct legal standards.

**III.**

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 12th day of January, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

14